# STATE OF MICHIGAN

# COURT OF APPEALS

ANITA E. BELLE,

        Plaintiff-Appellant,

v

DETROIT CITY CLERK and DETROIT
ELECTION COMMISSION,

        Defendants-Appellees.

UNPUBLISHED
August 23, 2018

No. 341158
Wayne Circuit Court
LC No. 17-016202-CZ

Before: CAMERON, P.J., and RONAYNE KRAUSE and TUKEL, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order denying her motion for injunctive relief and dismissing her complaint for declaratory relief in this election fraud action. We affirm.

On appeal, plaintiff argues that the trial court erred when it dismissed her complaint without discovery being conducted or a motion for summary disposition being filed, and that the actions taken during the November 7, 2017 general election, related to absentee-ballot processing, violated election challengers' rights and the Voting Rights Act (VRA), 52 USC 10101 *et seq*.

Plaintiff, the chairperson for the Voting Justice Committee, acted as an election challenger to the November 7, 2017 general election in Detroit, Michigan. On Election Day, plaintiff observed the processing of absentee ballots at Cobo Hall in the Absentee Voter Processing Board room. She observed the signatures on absentee ballot envelopes get verified by comparison to the voter's signature on their absentee voter application, which was accessible on the Qualified Voter File (QVF) on six computers located in the room. At around 3:15 p.m., plaintiff witnessed colored photocopies of absentee ballot envelopes being brought into the room rather than the actual envelopes. These were used for verification. Plaintiff was informed by two supervisors of the processing room that the actual envelopes were checked using the QVF at the Department of Elections office located on West Grand Boulevard. Plaintiff did not believe that each photocopied envelope had a preexisting corresponding absentee voter application, and she asserted that the applications that were present were fabricated to conceal a conspiracy to commit election fraud. Janice Winfrey was the sitting City Clerk at the time of this election, and she was reelected. Plaintiff filed an emergency complaint asking for injunctive relief and a

-1-

declaratory judgment against defendants. The trial court denied her request for injunctive relief, and dismissed the claims. This appeal followed.

## I. DISMISSAL OF ACTION

On appeal, plaintiff argues that the trial court erred when it dismissed her claims, including her claim for a declaratory judgment, without the parties conducting discovery, filing a motion for summary disposition, or the court holding a hearing in which witnesses could testify. We disagree.

This Court reviews the grant or denial of injunctive relief for an abuse of discretion. *Martin v Murray*, 309 Mich App 37, 45; 867 NW2d 444 (2015). "An abuse of discretion occurs when the court's decision results in an outcome that falls outside the range of principled outcomes." *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 528; 872 NW2d 412 (2015). This Court reviews de novo a trial court's order granting summary disposition. *Wilson v King*, 298 Mich App 378, 381; 827 NW2d 203 (2012).

In responding to an order to show cause by the trial court, in which they requested that the trial court "enter a final order dismissing this action," defendants did not cite a court rule. Similarly, the trial court did not cite a court rule when it dismissed the action at the show cause hearing. The trial court stated, "I'm going to deny the request for [a] preliminary injunction. And because I see no basis for a claim in this case, I'm going to dismiss this case." We construe the trial court's action as having granted summary disposition to defendants pursuant to MCR 2.116(I)(1), which provides:

> If the pleadings show that a party is entitled to judgment as a matter of law, or if the affidavits or other proofs show that there is no genuine issue of material fact, the court shall render judgment without delay.

This court rule allows the trial court to grant summary disposition sua sponte. *Boulton v Fenton Twp*, 272 Mich App 456, 462-463; 726 NW2d 733 (2006). The court may "render judgment without delay" pursuant to MCR 2.116(I)(1) if one of the two enumerated conditions is met. *Id*. at 463 (quotation marks omitted). Here, the trial court granted defendants summary disposition because it determined that there was no evidence of any violation of the Election Officials' Manual by defendants, which precluded any award of injunctive relief.[1]

To obtain a preliminary injunction, the moving party must demonstrate the following four factors:

> "(1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would

---

[1] The merit to plaintiff's claims regarding the photocopying procedure used by defendants is fully discussed under Part II of this opinion.

be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued." [*Hammel v Speaker of House of Representatives*, 297 Mich App 641, 648; 825 NW2d 616 (2012) (citation omitted).]

Injunctive relief is an "extraordinary remedy" that will only be granted "when justice requires, there is no adequate remedy at law, and there is a real and imminent danger of irreparable injury." *Janet Travis, Inc v Preka Holdings, LLC*, 306 Mich App 266, 274; 856 NW2d 206 (2014). "[A] particularized showing of irreparable harm is an indispensable requirement to obtain a preliminary injunction. The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 9; 753 NW2d 595 (2008).

We agree with the trial court's analysis of the four-factor test and its conclusion that plaintiff was not entitled to injunctive relief. Plaintiff did not demonstrate that she would prevail on the merits of her claim because she failed to produce any actual evidence of election fraud. She relied on her affidavit outlining what she observed on Election Day regarding the absentee ballots. But the processing of absentee ballots was fully explained by the affidavit of Daniel A. Baxter, the director of the City of Detroit Department of Elections.[2] Consequently, there was no evidence to show that the photocopy procedure was a violation of the manual, that it had an effect on the election, or that the election results were based on fraud. Thus, plaintiff did not demonstrate that she would suffer irreparable harm if the absentee ballots were not enjoined from inclusion in the election results. *Hammel*, 297 Mich App at 648. Plaintiff also failed to demonstrate that she would be harmed more by the absence of an injunction than defendants would be by the granting of the relief. *Id*. The trial court noted that enjoining inclusion of all absentee ballots would have a significant effect on closer races of the general election. Lastly, there would be great harm to the public interest if the injunction was issued. *Id*. More than 31,000 voters voted by absentee ballot in the general election, and plaintiff sought to enjoin inclusion of all absentee ballots. This would lead to the disenfranchisement of nearly one-third of all the votes cast in that election. In the absence of any proof of election fraud, the injunction would pose a great harm to the public interest by disenfranchising so many voters.

Thus, the trial court did not abuse its discretion when it determined that plaintiff was not entitled to injunctive relief and did not err when it dismissed plaintiff's claims. Plaintiff also asserts that dismissal was improper because no discovery had taken place. However, MCR 2.116(I) does not require discovery before a court may grant summary disposition. Instead, the court rule permits the trial court to grant summary disposition based on the pleadings, affidavits, or other offers of proof "without delay." MCR 2.116(I)(1).

Plaintiff also avers that "[a]lthough the complaint alleged that the actions of city officials diluted the votes of black Detroiters in violation of laws including the VRA, this matter was not properly heard." Plaintiff's emergency complaint merely alleged that Winfrey "violated other

---

[2] The details of the content provided in Baxter's affidavit are provided *infra*.

state and federal laws including, but not limited to, the Voting Rights Act of 1965 and civil RICO [Racketeer Influenced and Corrupt Organizations Act]." Plaintiff did not cite to any specific provision of the VRA, or explain how Winfrey violated it. The complaint did not address "diluted" votes of the Detroit African American community. This argument was not asserted by plaintiff at the show cause hearing, nor addressed by the trial court. Plaintiff did not fully address her claims pursuant to the VRA until her brief on appeal. Thus, plaintiff's claim that the trial court erred by dismissing her complaint without addressing the VRA is without merit because this issue was not fully asserted by plaintiff in the lower court before the dismissal of her claims.

## II. ELECTION FRAUD

Plaintiff next argues that the statutory rights of election challengers and the VRA were violated when photocopies of the absentee ballot envelopes were used to verify signatures in comparison to the absentee ballot applications at the Department of Elections office, rather than at the Absentee Voter Processing Board room, where the voter applications and election challengers were present. We disagree.

This Court reviews a decision to grant or deny a declaratory judgment de novo, and the trial court's factual findings regarding this decision are reviewed for clear error. *Ter Beek v City of Wyoming*, 297 Mich App 446, 452; 823 NW2d 864 (2012), aff'd 495 Mich 1 (2014). Clear error occurs "when this Court is left with a definite and firm conviction that a mistake has been made." *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 660; 819 NW2d 28 (2011) (quotation marks and citation omitted). As noted above, plaintiff's claim pursuant to the VRA was not fully raised, addressed, or decided by the trial court. Thus, plaintiff's unpreserved claim regarding the VRA is reviewed for plain error. *Demski v Petlick*, 309 Mich App 404, 426-427; 873 NW2d 596 (2015). "Plain error occurs at the trial court level if (1) an error occurred (2) that was clear or obvious and (3) prejudiced the party, meaning it affected the outcome of the lower court proceedings." *Duray Dev, LLC v Perrin*, 288 Mich App 143, 150; 792 NW2d 749 (2010).

MCR 2.605(A)(1) allows a court to "declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is our could be sought or granted." In her complaint, plaintiff requested that the court

> issue a declaratory judgment that copying the envelopes of the absentee ballot envelopes rather than matching the actual absentee ballot envelopes on Election Day against the absentee voter applications in the presence of election challengers is unlawful.

The court determined that the signature verification process using the photocopied envelopes was not in violation of the Election Officials' Manual and that there was no evidence of "voter

-4-

fraud."[3]   Thus, the trial court dismissed plaintiff's claims rather than enter a declaratory judgment.  We agree that the process was not in violation of plaintiff's rights as an election challenger.

Plaintiff, as a chairperson for the Committee for Voter Justice, was granted permission to act as an election challenger during the November 7, 2017 general election by Baxter, acting as director of the Detroit Department of Elections, pursuant to MCL 168.731.  Plaintiff alleges that the photocopied envelope process prevents election challengers from exercising their statutory rights to challenge the absentee ballot process.

MCL 168.733 provides the rights of election challengers.  They must be provided space at the polling place to observe the election procedure.  MCL 168.733(1).  Relevant to plaintiff's claims, challengers may "[o]bserve the manner in which the duties of the election inspectors are being performed," "[c]hallenge an election procedure that is not being properly performed," and bring to an election inspector's attention "[a] violation of election law or other prescribed election procedure."  MCL 168.733(1)(b), (d), (e)(*iv*).  Plaintiff did not specify which of these rights, or any other right provided in the statute, were violated by the process used for absentee ballots.  Rather, plaintiff asserted that defendants' actions "circumvent[ed] and defeat[ed] cause-worthy election challenges of absentee ballots processed that did not have a corresponding absentee ballot application."  Plaintiff did not provide any evidence of any photocopied absentee ballot envelope that did not have a corresponding absentee ballot application contained in the QVF.  Rather, plaintiff's affidavit demonstrated that she observed the employees of the City Clerk when they were performing their duties, she voiced her concerns to these employees working in the absentee ballot processing room that day, and she filed a complaint alleging that the absentee ballot signature verification process was not properly performed.  We hold that plaintiff's right as an election challenger to bring a challenge was not impeded.  MCL 168.733.

On appeal, plaintiff asks this Court to remand this matter

for proceedings on the claim of a declaratory judgment regarding the unlawfulness of the photocopied absentee ballot envelopes, with instructions that provide more weight to the rights of election challengers and accuracy and transparency of election results as opposed to the alleged expediency of counting the ballots that may be invalid due to ballot stuffing.

Thus, as discussed *infra*, we review whether the process of using the photocopied envelopes to verify the signature against the application was invalid because even assuming that such a process was followed, if the procedure is nevertheless valid, it necessarily follows that plaintiff's rights were not violated.

---

[3] Although the trial court referenced "voter fraud" in its holding, earlier in the hearing, plaintiff's counsel asserted that she mistakenly used the term "voter fraud" instead of "election fraud," and seemingly, the trial court misspoke as well.

MCL 168.761 provides for the issuance of absentee voter ballots. When the City Clerk's office receives an application for an absentee ballot, the signature on the application must be checked for accuracy with the signature on the voter registration card contained in the QVF. MCL 168.761(1), (2). When the signature matches, an absentee ballot is provided to the applicant. MCL 168.761(1), (2). Absentee voters must place their ballots in the provided envelope, sign the envelope, and mail or hand deliver the envelope to the City Clerk's office. MCL 168.764a. Received absentee voter ballots are verified as follows:

(1) Upon receipt from the city, township or village clerk of any envelope containing the marked ballot or ballots of an absent voter, the board of inspectors of election shall verify the legality of such vote by an examination of a digitized signature for the absent voter included in the qualified voter file under section 509q or the registration record as provided in subsection (2) to see that the person has not voted in person, that he is a registered voter, and that the signature on the statement agrees with the signature on the registration record; and by an examination of the statement of such voter to see that it is properly executed.

(2) The qualified voter file shall be used to determine the genuineness of a signature on an envelope containing an absent voter ballot. Signature comparisons shall be made with the digitized signature in the qualified voter file. If the qualified voter file does not contain a digitized signature of an elector, or is not accessible to the clerk, the city or township clerk shall compare the signature appearing on an envelope containing an absent voter ballot to the signature contained on the master card. [MCL 168.766.]

MCL 168.792a(1) permits the use of absent voter counting boards, which were used by the city of Detroit for the November 7, 2017 general election. And MCL 168.792a(6) provides that

[a]bsent voter ballots shall be delivered to the absent voter counting boards in the sealed absent voter ballot return envelopes in which they were returned to the clerk. Written or stamped on each of the return envelopes shall be the time and the date that the envelope was received by the clerk and a statement by the clerk that the signatures of the absent voters on the envelopes have been checked and found to agree with the signatures of the voters on the registration cards or the digitized signatures of voters contained in the qualified voter file as provided under [MCL 168.766].

The statute further authorizes the Secretary of State to "develop instructions consistent with this act for the conduct of absent voter counting boards." MCL 168.792a(17).

Chapter 8 of the Election Officials' Manual, which was issued by the Secretary of State, was provided to the lower court as an exhibit to Baxter's affidavit. Absentee ballots must be processed and counted by the election inspectors. Regarding processing, the manual states:

All valid absent voter ballots received by the clerk prior to Election Day and their corresponding absent voter ballot applications are delivered to the [absentee

voter] counting board at the start time established by the election commission and the precinct at some point after the polls open.

* * *

While the processing steps may be tailored to meet administrative preferences, care must be taken to ensure that ballot secrecy is not compromised in any way.

The legality of the absentee ballot is verified by checking the signature on the envelope in comparison to the signature on the application, and the "ePollbook" or QVF to confirm that the same individual did not vote in person.

Baxter's affidavit provided the procedure of the Department of Elections in processing absentee ballots that are received before Election Day, and on Election Day. If a ballot was returned before Election Day, the signature on the envelope was verified against the signature in the QVF, the date was marked on the envelope and initialed by a City Clerk employee, and the application was pulled. The ballots received before Election Day were sorted and bundled by counting board (there are 100 in Detroit). On Election Day, the ballots and applications were delivered to the counting boards at Cobo Hall. All of the applications were kept on a centrally located table. Absentee ballots were picked up from the post office throughout the day of the election, and processed in the same manner by the Absentee Voter Processing Board at Cobo Hall. Once the signature on an envelope was verified against the signature on an application in the QVF, the envelope was delivered to the counting board, and the application was deposited on the centrally located table.

Absentee voters may also hand deliver their ballots on election day, to the City Clerk's office at the Department of Elections Office on West Grand Boulevard. These "walk-in" ballots were stamped with the date, the signature on the envelope was verified against the application in the QVF, and the envelope was initialed.

If the ballot is valid, a photocopy is made of the completed [] envelope. Throughout Election Day, walk-in ballots are delivered by the department of elections to the counting boards at Cobo Center, and the photocopy of the [ ] envelope is delivered to the [processing board] at Cobo Center. . . . For walk-in [absentee voter] ballots, the [processing board] uses the copy of the [] envelope to pull the absent voter application and complete the document by recording the date the ballot was returned. The completely processed application is then sent downstairs to the counting board and added to the other applications kept on the centrally located table . . . .

Baxter asserted that approximately 400 walk-in ballots were received on November 7, 2017, and that the procedure used was authorized by the Election Officials' Manual because all ballots were processed, and any delays in processing were reduced or eliminated. Over 31,000 absentee ballots in total were processed for this election.

The processing procedure used by defendants satisfies the requirement in MCL 168.764a that the City Clerk verify the signature on the envelope with the signature on the application

included in the QVF. Baxter attested that this verification is done for absentee ballots received before Election Day, by mail on Election Day, and by hand on Election Day. Baxter attested that the requirements included in MCL 168.792a(6) are also met. All absentee ballot envelopes are marked with the date received, and the employee's initials, indicating that the signature on the envelope was verified against the signature on the application in the QVF. The Election Officials' Manual requires all absentee ballots and their corresponding applications be delivered to the counting boards. Baxter attested that ballots received before Election Day were sent to Cobo Hall with their applications the day before the election. The ballots and the applications were kept on separate tables. Ballots received by mail or hand delivered on Election Day were processed, and then each ballot and its corresponding application were also delivered to Cobo Hall. The photocopying of the envelopes was a permissible, tailored step added for administrative preference by the Department of Elections. See Chapter 8 of the Election Officials' Manual ("[T]he processing steps may be tailored to meet administrative preferences . . . .").

The photocopy was merely used by the processing board to record the date that the ballot was returned; the signature on an envelope already had been verified using the application in the QVF when this occurred. Thus, contrary to plaintiff's suggestion, the fact that photocopies were used did not violate the absentee ballot processing requirements provided in the statutes or the Election Officials' Manual because the ballots were properly processed, and the photocopy was a permitted tailored step. The signature verification performed by the Department of Elections at its office before delivery of a ballot to Cobo Hall, and the photocopying of the processed envelope, did not violate the rights of election challengers.

As noted under Part I, *supra*, plaintiff did not fully articulate her argument that defendants' actions violated the VRA in the lower court, therefore effectively raising it for the first time in her brief on appeal. On appeal, plaintiff alleges that the processing of the photocopied envelopes outside the presence of election challengers constituted ballot stuffing, and therefore, the votes of the African-American community were diluted. She alleges a violation of 52 USC 10301,[4] which provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

---

[4] Plaintiff mistakenly cites to 42 USC 1973 as § 2 of the VRA, which is now codified at 52 USC 10301. Congress amended § 2 to no longer require a showing of intentional discrimination to prove a § 2 claim. *Ohio Democratic Party v Husted*, 834 F3d 620, 636 (CA 6, 2016). Pursuant to the amended statute, a violation can be proven by showing discriminatory effect alone. *Id*.

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v Gingles*, 478 US 30, 47; 106 S Ct 2752; 92 L Ed 2d 25 (1986). The statute authorizes claims for either vote dilution or vote denial. *Northeast Ohio Coalition for the Homeless v Husted*, 837 F3d 612, 626 (CA 6, 2016).

This Court follows the guidance provided in *Thornburg* to determine whether the VRA was violated under the "totality of the circumstances." *In re Apportionment of State Legislature-1992*, 439 Mich 715, 735; 486 NW2d 639 (1992). The United States Supreme Court provided a list of factors to consider in reviewing the totality of the circumstances:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction. [*Thornburg*, 478 US at 36-37 (quotation marks and citation omitted).]

Additionally, a court could consider "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* at 37 (quotation marks and citation omitted).

Plaintiff failed to demonstrate or even allege facts which would establish that any of these factors were implicated. She merely asserts on appeal that "there has been a significant lack of responsiveness on the part of many elected officials, irrespective of the elected officials' race, to the needs of African-Americans in Detroit." There is no evidence to support this assertion in the lower court record. Plaintiff asserts on appeal that research done by the Reparations Labor Union regarding the November 2017 general election indicated that there were more ballots cast than the number of registered voters. However, this data was not offered in the trial court, and a party is not allowed to expand the record on appeal. *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002). Accordingly, we shall not consider it.

Consequently, there is nothing in the lower court record to substantiate plaintiff's claims that "ballot stuffing" or election fraud occurred. Plaintiff further has not provided any evidence that African-Americans voted in higher percentages by absentee ballot as opposed to at the polls on election day. Absent such data, there is no basis for concluding that the photocopying of the envelopes of validly processed absentee ballots or absentee ballots hand-delivered on election day had any disproportionate effect on African-American voting. Thus, plaintiff has failed to demonstrate a vote dilution claim pursuant to the VRA under the totality of the circumstances.

Affirmed.

/s/ Thomas C. Cameron
/s/ Amy Ronayne Krause
/s/ Jonathan Tukel